UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
JG & PG on behalf of their minor child, JG III and   :
on their own behalves, LA & GA on behalf of their           08 CV 5668 (SCR)
minor child, FA, and on their own behalves, MS   :
and RS, on their own behaves and on behalf of their
minor child, MAS, TS and NS on behalf of their   :
minor child VS and on their own behalves, LB            DECLARATION
on behalf his minor child RB and on his own behalf, :
TC and TC, on behalf of their minor son, NC, and
on their own behalves, RB on behalf of her minor   :
son, NB and on her own behalf,

  :

          Plaintiffs,

  :

         v.

  :

TAMMY CARD, JOYCE SPIEGEL, LORRIE
REYNOLDS, JOSEPH LEVY, SHERRY   :
STREITAS, CAROL DeALLEAUME,
DR. ROBERT J. REIDY, JR., MAHOPAC   :
CENTRAL SCHOOL DISTRICT,

  :

          Defendants.
--------------------------------------------------------------X

       PAUL F. MILLUS declares, pursuant to 28 U.S.C. § 1746, that the following

statements are true and correct:

       1.      I am a member of the law firm of Snitow Kanfer Holtzer & Millus,

LLP, attorneys for the Defendants Robert J. Reidy, Jr., and the Mahopac Central School

District (the "District") in this action.  I respectfully submit this declaration in support of

Reidy's and the District's motion for an order pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure to dismiss the complaint with prejudice.

       2.      A true copy of Plaintiffs' Complaint, dated June 20, 2008, annexed to

this Declaration as Exhibit "A", is relevant to the resolution of this motion and is also

referred to in the accompanying memorandum of law.

WHEREFORE, it is respectfully requested that this Court issue an order granting the instant motion to dismiss and granting such other and further relief as the Court deems just and proper.

Dated:     August 15, 2008
           New York, New York


_____
PAUL F. MILLUS (PM 8240)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**⬛ORIGINAL**

-------------------------------------------------------------------x

JG & PG on behalf of their minor child, JG III and
on their own behalves, LA & GA on behalf of their
minor child, FA, and on their own behalves, M.S
and RS, on their own behalves and on behalf
of their minor child, MAS, TS and NS on behalf of
their minor child VS and on their own behalves,
LB on behalf his minor child RB and on his own
behalf, TC and TC, on behalf of their minor son,
NC, and on their own behalves, RB on behalf of her
minor son, NB and on her own behalf,

*JUDGE ROBINSON*

# 08 CIV. 5668

Plaintiffs,

v.

**COMPLAINT**

TAMMY CARD, JOYCE SPIEGEL, LORRIE
REYNOLDS, JOSEPH LEVY, SHERRY STREITAS,
CAROL DeALLEAUME, DR. ROBERT J. REIDY, JR.,
MAHOPAC CENTRAL SCHOOL DISTRICT,

Defendants.

-------------------------------------------------------------------x

## INTRODUCTION

1. Plaintiffs bring this action to redress federal and state rights violated by the conduct of

the defendants, acting under color of state law and within the scope of their employment.

2. As set forth more fully below, each plaintiff is a parent of a vulnerable, substantially

delayed student, aged 5-7 and classified on the Autistic Spectrum, enrolled at all relevant times in

the defendant school district.

**JURISDICTION**

3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. secs. 1331, 1343 (3) & (4) and 42 U.S.C. secs. 1983 and 1988 as well as 28 U.S.C. sec. 1367 for the pendent state claims which arise out of the same nucleus of operative facts.  Each plaintiff has satisfied all state law conditions precedent to the filing of the state law claims included herein.

**DEFENDANTS**

4.  Defendant Tammy Card ("Card") was the teacher assigned by defendant Mahopac Central School District, through Superintendent Reidy, to lead the Bridge Program at the Mahopac Falls Elementary School in 2005-06 and 2006-07.

5.  Defendant Carol DeAlleaume served as interim principal of Mahopac Falls Elementary School second semester of the 2006-07 school year and, as such, was directly responsible for supervising the conduct of defendants Card, Reynolds, Spiegel, Streitas and Levy.

6.  Between September 2005- March 2007, defendant Spiegel was a speech pathologist assigned to the Bridge Program and responsible for the provision of speech and language services to the children in the program.

7.  Defendants Lorrie Reynolds, Joseph Levy and Sherry Streitas were all teacher aides assigned to the Bridge Program for the 2006-07 school year.

8.  Defendant Mahopac Central School District is a school district organized pursuant to the laws of the state of New York within this judicial district.

9.  Defendant Superintendent of Schools Reidy is responsible for the operation of the school district, including the hiring, retention and appropriate training and discipline of staff, their supervision and discipline.

Page -2-

## STATEMENT OF FACTS

## THE BRIDGE PROGRAM

10. According to four adults who worked in the Bridge Program, the following behaviors occurred in that class during the 2006-07 school year and in front of each plaintiff's child:

a) Defendants Card, Levy and Reynolds used degrading nicknames for the autistic children in the class, including "Sloth," "Poor Thing," "Drool Machine, "Nico Nico Pancake Freako," "Mosquito," "Old Man," "Froggy," "Satan's Child," "Chicken Butt" and "Rodent".

b) Levy slapped Card's buttocks and massaged her in front of the students;

c) Spiegel and Levy gave each other massages in front of the students;

d) Levy grabbed Streitas' breasts in front of the students;

e) Spiegel exposed her breasts to the students while announcing that she wanted to "brighten your day,"

f) Spiegel dressed in a crocheted blouse, without a bra, and exposed her nipples to the children;

g) Spiegel falsified school records to show that she provided required speech therapy services to the students when she did not do so;

h) Levy and Reynolds engaged in sexually explicit discussions in front of the students;

i) Levy and Reynolds altered a manually-operated communication device so as to make fun of and humiliate its user;

j) the placement by these adults of several children in isolated rooms while they screamed in a manner which deeply disturbed and frightened the other children in the class.

11. Other inappropriate practices were permitted by the defendant assigned to the Bridge

Program in 2006-07, including, defendant Levy rolling a ball at students' legs, attempting to get them to trip; defendant Card physically restraining children, including FA, in a manner not contemplated by their IEPS and children being physically restrained or isolated in violation of their IEPS or behavioral plans, if any.

12. Upon information and belief, Card's practice of physically restraining students was reported to Jennifer Portillo, then principal of the elementary school, by DK's family, during the 2005-06 school year. [1]

13. On March 20, 2007, defendant Carol DeAlleaume notified plaintiff parents that she and defendant Superintendent Dr. Robert J. Reidy, Jr.,would like to meet with them [and others] on March 23, 2007 "to provide information regarding the Bridge program."

14. On March 23, 2007, at a meeting, defendant Reidy told parents that there had been allegations made regarding teachers within the Bridge Program, that defendants Reidy and the district were investigating and that he had no information which he could then release to anyone. Reidy also stated at this meeting that there was dissension between aides and the teacher and that this had nothing to with the children, that the district was investigating but could not release any information as it wasn't pertinent to the children.

15. On March 297, 2007, at a second meeting, Reidy reported that certain children in the class had been involved but would not discuss what happened with all parents.

16. On May 1, 2007, defendant DeAlleaume notified plaintiff parents that "[d]ue to the current circumstances, the district is unable to provide you with the third quarter progress reports on the goals and objectives for the students in the Bridge class."

---

[1] "DK" are the initials of the student referred to as "D" in this Complaint.

17. In early May 2007, the Carmel Police Department arrested defendants Spiegel, Card, Levy and Reynolds for child endangerment arising from the mistreatment of plaintiffs' children, among others.

18. Following the arrest, defendant Reidy stated, "Parents entrust their children to us and I will do everything within my power to protect all of our children all of the time."

19. Following the revelations of staff behavior set forth in this complaint, defendant district engaged the services of Lenore Deck "to train the staff members and oversee the Applied Behavior Analysis [ABA] /discrete trial teaching of the students in the Bridge Program."

**JG III**

20. Plaintiffs JG Jr. & PG are the parents of JG III, who was born on June19, 2000.

21. In January 2003, when he was 2.6 years old, JG III was diagnosed with Autism and Pervasive Developmental Disorder [hereinafter "PDD"].

22. In March 2005, an annual review by a physical therapist states that "[JG III] is very friendly and loves playing with therapist. He gets distracted at times but never complains and always tries his best to finish activities presented to him."

23. At the end of the 2004-05 school year, before his entry into the Bridge Program, JG III was reported as having a "best friend" and as having made substantial progress in toilet training. His teacher described him as a "happy, friendly little boy who is a pleasure to have in class."

24. Between September 2005 and June 2007, while resident with his parents in Carmel, New York, JG III was enrolled in the Mahopac Central School District.

25. Commencing in the 2005-06 school year and for the two succeeding school years,

JG III was enrolled in the Bridge Program at Mahopac Falls Elementary School in a class taught by defendant Card and staffed by, **inter alia**, defendants Spiegel, Streitas, Reynolds and Levy.

26.  The Bridge Program was intended as a placement for autistic children, many of whom were non-verbal.

27.  During the 2005-06 school year, JG III was mainstreamed for one half the school day into a Regular Education Kindergarten classroom taught by a Mr. Noto, assisted by a one-to-one classroom aide.

28.  JG Jr. and/or PG expressed to defendant Card and Noto concerns that JG III was not behaving well at home and was anxious about attending school.

29.  During the 2005-06, JG III was supposed to receive regular speech language services from defendant Joyce Spiegel, a licensed speech language pathologist.

30.  During the 2005-06 school year, upon information and belief, defendant Spiegel intentionally falsified reports about JG III, attempting to portray him as having made more progress than he had in this area of need.

31.  While enrolled in the Bridge Program, JG III strongly expressed his desire not to attend school and would become quite anxious and teary eyed, carrying on for hours on Sunday evenings, as well as during the week, in anticipation of attending school the next day. When asked what the problem was, JG III would respond that "D is screaming." [2]

32.  When his parents reported this response to school authorities, including Card, she advised that "we have a screamer," referencing D, the child in the class who JG III associated

---

[2] "D" represents the initial of a student whose first name JG III would call when making this statement.

with screaming.

33. While attending this program, JG III's behavior deteriorated and he became rude, bossy, used inappropriate language and became highly sexualized in his conduct, asking people if they had penises and touching others' crotches. His anger became so disruptive that his parents found it difficult to invite people over to their hoe and JG III would display relentless disruptive behavior.

34. As of March 2006, JG III showed a delay in "total language" of some 18 months as measured by the Brigance Diagnostic Inventory of Early Development II and a delay of some 17 months in "Daily Living" skills and an even greater divide between his age and development in Social/Emotional development [34 months].

35. As of April 2007, JG III's social/emotional development and language skills continued to be areas of weakness; in September 2007, JG III told his mother that defendant Spiegel allowed him to watch Teletubbies during speech time.

36. In April 2007, in a behavioral and educational report prepared by TheraCare, it was noted that, during educational testing, JG III became "easily distracted and need[ed] constant redirection to stay focused on the task."

37. About five months after he started attending the Bridge Program, though previously toilet trained, JG III began having toileting accidents.

38. In May/June 2007, a child psychiatrist noted that JG III exhibited a number of behaviors consistent with aberrant classroom practices: for instance, he would suddenly start screaming, "D stop screaming," an apparent reference to another child who teachers would isolate in the bathroom and allow to scream. He would repeatedly ask a stranger trying to

converse with him, "Why are you looking at me?" and then ask them to "stop looking at me."
He also referenced yelling by defendant Levy, complaining frequently, "Joe yell at you."

39.  The same child psychiatrist concluded that JG III's behavior "is suggestive of a child
who has been traumatized. The change of behavior, the appearance of anxiety about going to
school, and the decrement of that anxiety once the teachers in the school changed suggest a link
between the anxiety and the teachers' behavior." Indeed, while attending the Bridge Program, JG
III had frequent nightmares and awaken calling for his parents.

40.  Likewise, Dr. Boris Rubenstein, a child psychiatrist, concluded that JG III had been
exposed to "inappropriate sexual contact."

41.  In June 2007, Dr. Luck concluded that JG III was an emotionally fragile and
vulnerable child; during his years in the Bridge Program and thereafter, JG III showed anxiety
when anyone elevated the volume of their voice.

42.  At a new school in another state in September 2007, JG III would not use the
bathroom and would come home and wet himself.

43.  At a new school in another state in September 2007, JG III was anxious about
entering a new speech class.

44.  At his new school in another state in November 2007, JG III was moody, did not
want to be in his class or his school and showed substantial anxiety.

45.  As of November 2007, a child psychiatrist evaluated JG III and concluded that he
continued to manifest the effects of "an abnormally punitive school environment;" more
specifically, JG III showed very poor eye contact, spoke in a very mixed up manner, spoke in
"yelling phrases" which "seem to be direct quotes from probable situations in the past" and

presented with "great difficulty interacting on any level." JG III was "irritable and extremely anxious"; he "whines" and "perseverates" and "was very oppositional and defiant." He often said things like, "Stop looking at me" or "you're bothering me" in an angry voice.

45A.  While attending the Bridge Program, JG III became more physically aggressive toward his younger brother and his parents.

## FA

46.  At all relevant times, plaintiffs LA and GA resided in the defendant school district and they are the natural parents of FA.

47.  FA was born on August 15, 2001; at about three years of age, FA was diagnosed with PDD NOS.

48.  On June 8, 2007, LA and GA filed a notice of claim on their own behalves and on behalf of their minor son, FA, as against defendants alleging that they had committed assault, battery, negligence, intentional infliction of emotional distress, loss of educational opportunities and other personal injuries.

49.  In September 2006, while classified on the autistic spectrum [PDD NOS], FA commenced attendance at the Bridge Program in the Mahopac Falls Elementary School.

50.  At the time of his enrollment, FA was experiencing serious language delays and difficulties in interpersonal communication.

51.  At the time of this enrollment, FA also manifested the criteria for a diagnosis of Attention Deficit Disorder.

52.  At the time of this enrollment, FA was unable to demonstrate his intelligence

verbally since he was unable to speak in coherent, clear sentences.

53. At the same time, during the 2005-06 school year, FA had made progress in social interactions both at school and in his family unit and his psycho-social history dated April 21, 2006 so reflects.

54. Early during the 2006-07 school year, GA questioned defendant Card about her son's reluctance to go to school.

55. GA observed her son cry, kick and scream as defendant Card would physically remove FA from GA's arms.

56. GA had made no like observations of her son when leaving him at other schools or with relatives.

57. While FA was attending the Bridge School, he became more physically aggressive with his younger brother and toward his parents.

58. In response to GA's inquiries about this behavior, defendant Card stated that it was a new year, it's kindergarten and probably difficult for him and that FA was in the best hands and will be fine.

59. On or about March 30, 2007, LA and GA received a letter from Vincent Quartararo, Assistant Superintendent of Schools, reporting that "in February 2007, a District employee punished FA by separating him from the class and refusing to allow him to eat his lunch that day....FA's behavioral Plan Summary indicates that when he is not following directions, he should be redirected to completed the requested behavior from the location where the direction

was given." [3]

60. On information and belief, on multiple occasions, defendant Levy held FA's head down on the desk in the classroom for a count of 10.

61. This information became known to LA and GA through a police detective who recounted that defendant Card admitted observing Levy so conduct himself.

62. Another child in FA's class told GA that Levy put FA in the closet in the gym.

63. That child's mother, plaintiff RS, as identified above, reported the same to school authorities in April 2007.

64. While in the Bridge program, FA was also made to stand when he ate his lunch as a punishment for not doing what he was supposed to do.

65. In April or May 2007, GA learned this from an aide, Debbie Grandinetti, who commenced working with FA after the Bridge program staff was replaced in March 2007.

66. Between January and April 2007, GA observed that FA was "obsessing" about breasts and penises. This behavior stopped after the re-structuring of the Bridge Program and the removal of defendants from that program.

67. In April 2007, FA repeatedly resisted transitioning from his mother to his class. This occurred on April 19, April 20, April 23, 2007 and featured significant tantrums on school grounds when FA needed to leave his mother and enter his classroom.

68. By letter dated May 2, 2007, Quartararo purported to advise LA and GA that "on March 1, 2007, Tammy Card, a District employee, was observed struggling with FA in a hallway

---

[3] In fact, at the time of this correspondence, FA had not had a functional behavior assessment.

of the Mahopac Falls Elementary School. It has been further reported that Ms. Card was heard saying, "Stop or I'll let go" several times as she held F's arms back while he struggled to go forward. While FA continued to struggle to go forward, it was reported that Ms. Card released FA's arms, causing him to fall to the ground and injure his nose and face." School officials also reported to plaintiffs LA and GA that defendant Card did not take FA to the school nurse for medical treatment. The district advised, "As you know, F is classified as a student with a disability by the Committee on Special Education and there is nothing in his Individualized Education Program that calls for such action. Also this action is counter-productive to effective behavior modification techniques."

69. LA and GA did not receive the letter dated May 2, 2007, but did learn about the reported incident from a detective investigating the case against Card.

70. On March 1 or 2, 2007, noting her son's physical injuries, Card called GA and stated that she was holding F by his backpack and he pulled forward and it slipped out of her hand and he hit the ground and his nose was bleeding.

71. The account Card provided was materially different from that provided GA by a detective investigating this matter and the account allegedly written on May 2, 2007 by Quartararo.

72. The district's educational assessment, dated May 3, 2007, and prepared by Noelle Lofaro, who replaced Card about six weeks earlier, notes that at times FA is work resistant and displays escape motivated behaviors, prompting him to run from his instructor and verbally state that he does not want to work. Attempts to control him increased his tantrums.

73. FA's 2006-07 IEP included eleven speech/language related goals/objectives.

74. The testing done by Ms. Lofaro, includes the K-SEALS, battery demonstrates that FA remained far below average in vocabulary, numbers, letters and words and both expressive and receptive language scales.

75. According to Candida Fink, a psychiatrist who evaluated FA in May 2007, during the 2006-07 school year, FA showed "a significant decline in function. He has become increasingly anxious around anyone besides his parents. He has developed severe separation anxiety, requiring hand over hand support to transition to school on multiple mornings. Parents report that he has been increasingly avoidant of doing any school work. He doesn't like school anymore and often days he doesn't want to go. He previously loved school and couldn't wait to get there. He has also developed nightmares – waking up saying, `Don't touch me...Don't touch me' according to parents."

76. In interacting with FA, Dr. Fink reported that he did want to come into the room to meet her, that he was gaze avoidant and wouldn't answer any questions.

77. According to Dr. Fink, "this year [06-07], FA has regressed considerably in the context of a classroom in which he was afraid of the adults for much of the day for many months. The most notable regression is in the development of new and severe separation anxiety symptoms." After noting that adult authorities are dealing with the situation now, Dr. Fink opined that "the damage has been done to F's development emotional and behavioral systems."

78. The school district's own OT evaluation of FA, completed in late May 2007 by Sharon Smith, concedes that he "has demonstrated inconsistent gains in his ability to handle frustration, control his impulses, turn taking, waiting, delaying gratification."

79. In June 2007, a board certified behavior analyst, Dr. Vincent J. Carbone, noted that

the "intensity of F's problem behaviors will preclude his involvement in least restrictive

educational placements, community and family events and normalized typical environments."

80.   Through Lenore Deck, defendant district developed a functional behavioral

assessment for FA in June 2007 noting as "target behaviors": "non-compliance to an adult's

directives" and "tantrums, which typically are an escalation from non-compliance."

81.   Effective September 2007, FA was enrolled at Lakeview Elementary School, also

within the defendant district.

82.   After the start of the 2007-08 school year, defendants Reidy and district placed two

of the aides from the Bridge Program at the Lakeview Elementary School.

83.   Upon learning of the presence of these two adults in his new school building, FA

began again having nightmares .

84.   A significant deterioration in FA's behavior followed at home and at school and FA

had frequent disassociation episodes while at Lakeview.

85.   On October 21, 2007, while at the Lakeview Elementary School, FA had a major

"meltdown," which lasted some 45 minutes and included his throwing objects at others, his

refusal to comply with adult direction and his repeated demands for his parents.

86.   Thereafter, FA had his tonsils removed.

87.   In light of his deteriorating behavior which they believed had been triggered by the

reassignment of two aides he associated with the Bridge Program and their conclusion that

Lakeview staff could not handle FA's aggressive behavior, LA and GA did not return FA to

Lakeview Elementary School.

88.   By December 2007, the defendant district's CSE "progress notes" reflect that FA was

still struggling with serious ongoing behavioral problems, including tantrums and outbursts and an unwillingness to comply with adult directions.

89. As of December 2007, at defendant district's expense, FA began attending the Therapeutic Day program at Green Chimneys, a private state approved placement.

90. As of March 2008, a Green Chimney evaluator needed seven sessions to complete an initial speech and language assessment for FA. "His inability to focus led to lack of cooperation."

91. On the March 2008 testing, FA showed substantial regression in both auditory comprehension and expressive communication.

## MAS

92. At all relevant times, MS and RS resided in the defendant school district and are the natural parents of MAS, a classified student.

93. MAS was born on October 22, 2000.

94. When he was about three years old, MAS was first seen by a developmental neurologist, Dr. Glen Belkin, who diagnosed MAS with Pervasive Development Disorder [PDD].

95. In September 2005, MAS commenced attendance at the Bridge Program.

96. By the end of September 2005, RS observed that her son's behavior had changed and he did not want to get on the bus and go to school.

97. Through the 05-06 school year, MAS became progressively more aggressive, started tantruming and became more emotional.

98. During the 05-06 school year, MAS struck his mother on several occasions and threw

things around at his home.

99. RS called Card and asked whether her son was being aggressive in school. RS also discussed this issue with Card when she dropped MAS off at school in the mornings.

100. Card said he was fine and that she would take care of it.

101. In fact, according to Lenore Dweck, in November/December 2005, she was to perform a functional behavior analysis on MAS [as was required by his IEP] but defendant Card kept cancelling and finally told Dweck that it was no longer needed.

101A. Dweck told RS that card is the only teacher that she had ever worked with who would not allow her to observe in her classroom.

101B. About six weeks after school started in 2005-06, RS called a CSE meeting and that committee added one-on-one counseling to be provided in Card's classroom by Tara Velez.

102. In fact, despite substantial effort, RS has never been able to verify that Velez provided any of this related service.

103. Toward the beginning of the 05-06 school year, RS reported to Card that, after MAS commenced at the Bridge Program, he stopped using the toilet at home.

104. RS also observed that at the beginning of the 05-06 school year, half the time her son would come home soiled from the Bridge Program.

105. RS also noted that defendant Spiegel misstated her son's progress in speech and language in her reporting during the 05-06 school year.

106. RS raised this issue with Card who told her she would review it, but then never got back to RS concerning the issue.

107. During the 05-06 school year, defendant Card had represented to RS that MAS

Page -16-

would be mainstreamed half-time into Mr. Noto's regular kindergarten class.

108. Yet, in April 2006, at a CSE meeting, RS learned that this process had not yet even started and that Mr. Noto had not yet met her son.

109. In or around April 2006, Dr. Welkin prescribed liquid prozac in response to RS's concerns about her son's behavior; MAS did not want to go to school and would not get on the school bus.

110. Starting at the beginning of his second year in the Bridge program, MAS became more upset and disagreeable.

111. In October 2006, having observed this behavior, RS took MAS to a social worker, Linda Block.

112. Between October 2006 and March 2007, MAS became increasingly aggressive, upset and uncooperative.

113. In this time period, MAS continued to wet himself almost every day in school.

114. In January 2007, a home-based social worker employed by the Mahopac School District, Joan Baird, LCSW-R, noted her concern with the "frequency and intensity of M's temper tantrums at home. His mood is often labile and its is very often difficult for his family to anticipate his emotional reactions."

115. In mid-February 2007, RS attended a meeting with defendant Card at which this defendant laughingly admitted that MAS would not step foot in the bathroom at the school.

116. At about the same time, RS learned that defendant Card had not enlisted the assistance of the school psychologist in assessing or assisting MAS.

117. Plaintiff RS worked as a dental hygienist for five years before mid-March 2007,

when she quit working because MAS was distraught and she did not feel she could leave him with a baby-sitter after school.

118.   Through a general letter sent in the mail inviting them to a meeting for March 23, 2007, MS and RS learned that there was some issue with the Bridge Program.

119.   On March 23, 2007, defendant Reidy told the assembled parents, including plaintiffs, that there was a problem amongst the adults in the Bridge Program and they needed to figure out what happened and that several people were being suspended from work.

120.   At this same meeting, Dr. Reidy falsely stated that none of the children had been involved or affected.

121.   At the same meeting, when parents asked whether the issue had anything to do with a child their children reported screaming in the classroom, defendant Reidy disclaimed any knowledge of this.

122.   Joanne Sassone, a teacher's aide who worked with the Bridge Program in 2006-07, told RS that she had reported to school administrators misconduct in the Bridge program at least one month before district personnel advised parents of the issues.

123.   On March 29, 2007, school district personnel and members of the local police agency informed MS that his child had been abused at school.

124.   By letter dated March 30, 2007, Quartararo advised MS and RS that it was alleged that "numerous times over a period of approximately a month, a District employee directed classroom teacher aides to refrain from changing M's soiled diaper in a timely manner in an attempt to modify M's toileting behavior. ...[t]he nature of M's disability is such that this action, as alleged, could not constitute an effective behavior modification technique."

125. On April 27, 2007, RS met with defendant DeAlleaume, then principal of Mahopac Falls Elementary School.

126. At this meeting, RS reported that during the time defendant Card was supervising the Bridge Program, she allowed a teacher's aide, Kiki, order MS to place his face 7-8 inches from a wall and stand facing the wall as punishment.

127. At this meeting, RS reported that two of MAS' classmates had been placed in a closet with the door closed.

128. At this meeting, RS reported that her son exhibited fear of sleeping alone, talked in his sleep and woke in the middle of the night looking for his parents.

129. Sometime during the early part of the 06-07 school year, MAS began exposing himself to his sister and stating how big his penis had become.

130. In June 2007, RS reported to police authorities that her son had told her that defendants Levy and Reynolds took photos of some of the private parts of some of the students.

131. In late May 2007, Dr. Fink evaluated MAS and concluded that "His inflexibility, low frustration tolerance and reactivity were present at baseline but were remitting with treatment. In the last few months, he has regressed considerably. He has also shown a tremendous increase in anxiety over the last few months, in particular separation anxiety which is a new presentation for him. The regression back into more reactive and ineffective responses and into separation anxiety occurred in the content of a classroom in which he was afraid of the adults for much of the day for many months."

132. For the 2007-08 school year, MAS was enrolled in at the Fulmar Road Elementary School; one of the teachers aides suspended for the events at the Bridge Program, defendant

Freitas, was re-assigned to one of the secretarial desks at the main office of this school.

133. This re-assignment caused MAS anxiety and upset.

134. Through January 2008, plaintiffs MS and RS sought the re-assignment of Ms. Freitas, including at a January 8, 2008 meeting with defendant Reidy.

135. No such reassignment was undertaken.

136. As a consequence of the experiences to which he was subjected by defendants, MAS has continued to act out, including in sexually inappropriate manners with other children.

137. MS and RS have provided play therapy for MAS as a way to help him express what is bothering him.

138. On June 9, 2007, MS and RS filed a notice of claim against defendants arising from the conduct of adults employed by the district in the Bridge program.

**VS**

139. Plaintiffs TS and NS are the natural parents of VS who was born prematurely on April 3, 2000.

140. Plaintiffs TS and NS and their minor son, VS, all reside in the Mahopac Central School District.

141. In September 2005, VS enrolled in the Bridge Program.

142. In the spring 2006, NS found that the speech scores reported by defendant Spiegel, who was responsible for providing speech therapy to VS, were not consistent with scores attained by a private tester.

143. During the 2006-07 school year, VS expressed fear about going to school, telling NS that he did not want to put his head down on a table and yelling to people, "put your head

Case 7:08-cv-05668-SCR    Document 1    Filed 06/24/2008    Page 21 of 29

down.".

144.  When she inquired  regarding her son's comment, defendant Card stated that children were asked to put their heads down on their desks if they were not doing good listening.

145.  In late March 2007, TS and NS learned that defendant staff in the Bridge Program called VS "froggy" as a way of making fun of his voice, "old man" for the way he walks and "mosquito" because he was bothersome to the program staff and returned after being shooed away.

146.  While in the Bridge Program, defendant Levy pushed down VS's neck.

147.  Defendant Card forced VS to sit next to DK, whose screaming scared and distracted VS and denied him an appropriate education.

148.  VS also became apprehensive because he knew that D was placed in the bathroom alone, where he would scream endlessly.

149.  As a consequence of this form of discipline, VS became adverse to using the bathroom by himself and also became adverse to being in alone in a room without a family member or parent..

150.  In March 2007, defendant Card advised NS that she had drawings, made in the classroom, caricaturing her.

151.  As a consequence of the sexualized behavior to which he was exposed in defendant Card's class, between April-August 2007, VS became obsessed with his own penis and with women's breasts.

152.  In a report dated May 23, 2007, Dr. David H. Salsberg, Supervisor of Pediatric Psychology at the Rusk Institute for Rehabilitation, opined that the increased anxiety and

regressive behavior VS engaged in during 2006-07 was likely due to the events at school.

153. In a report dated May 21, 2007, Dr. Fink noted that VS exhibits "marked separation anxiety ...which is new for him this year. He did have some baseline anxiety that developed last summer, but nothing like what has occurred over the course of this school year."

154. In her report, Dr. Fink concluded that VS had Post Traumatic Stress Disorder- 'seen as regression with severe separation anxiety symptoms'. One aspect of this regression is that VS will only seep with his parents and not in his own room.

155. After the experiences of the Bridge Program, VS ran out of his home three times in the snow, went over one-half mile from home and caused his parents to have him wear a monitor bracelet and out alarms on their doors.

155A. After the treatment he received and witnessed at the Bridge Program, Vincent has become paranoid about the safety of other children.

156. On or about June 8, TS and NS filed a notice of claim on their own behalves and on behalf of VS against defendants.

**RB**

157. LB is the natural father and guardian for RB, a minor.

158. At all relevant times, LB and RB resided within the Mahopac School District and RB attended the Bridge Program during the 2005-06 school year.

159. On March 30, 2007, Quartararo advised LB and his wife that "a district employee routinely force-fed R while he was restrained by other District employees. On more than one occasion, this action caused R to vomit...this action, as alleged, would not constitute an effective feeding technique."

160. Between February 2006 and May 2006, on more than one occasion, defendant Card did restrain RB by holding his hands and his head in an attempt to force feed him.

161. Upon information and belief, RB did choke, vomit and gag as a result of this behavior causing a dangerous and traumatic situation.

162. Other adults were present when defendant Card behaved as set forth in paras.

163. None of these adults, all of whom were employees of the defendant school district, stopped Card from behaving as she did.

164. None of these adults, all of whom were employees of the defendant school district, contemporaneously reported Card's conduct to school authorities.

165. With leave of the Court, LB has filed a notice of claim on behalf of himself and RB.

**NC**

166. Plaintiffs TC and TC are the natural parents of NC who was born on August 9, 2001.

167. Plaintiffs TC and TC reside in the defendant school district, within this judicial district.

168. NC is classified as other health impaired and suffers from PDD.

169. In September 2006, NC enrolled at the Bridge Program.

170. At the time of enrollment, NC was on grade level in speech and was potty trained, as he had been since he was three years old.

171. Shortly after he commenced attending the Bridge Program, NC began to come home soiled.

172. During the same time period, NC had no accidents at home.

173.  Shortly after commencing the Bridge Program, NC became anxious whenever the bathroom door at home was closed.

174.  Starting in the fall 2006, NC would not use the bathroom at home unless the bathroom door was open; this behavior continues to this day.

175.  NC's fear of using the bathroom with the door closed derived from his experiences in the Bridge Program where students were kept in the closed bathroom against their will and screamed.

176.  During the 2006-07 school year, NC began to place his hands over his ears and yell "stop being mad, why are you mad at me?" whenever his mother even slightly raised her voice. This behavior derived from NC's witnessing harsh verbal assaults by defendants employed to work in the Bridge program.

177.  After the 2006-07 school year, adults familiar with NC have noticed a lack of self-confidence and self-esteem; this continues to the present day.

**NB**

178.  Plaintiff, RB, is the natural mother of NB, a minor.

179.  At all relevant times, Both RB and NB reside in the defendant school district, within this judicial district.

180.  In April 2006, NB was diagnosed with Autism.

181.  In September 2006, NB enrolled in the Bridge Program.

182.  Between September 2006 and March 2007, when he disembarked from the school bus, NB would say, "I got boo boo, got boo boo."

183.  NB's tantrums and crying increased between September 2006 and March 2007.

184. On numerous occasions between September 2006 and March 2007, NB refused to get on the school bus.

185. Upon and information and belief, during the 2006-07 school year, defendant Levy rolled large balls at NB's legs in a manner intentionally designed to create a substantial risk that NB would trip and fall.

186. RB learned of this conduct through defendant DeAlleaume in late March 2007.

187. At the same time, defendant Dealleaume also informed RB that staff had encouraged another student in the Bridge Program to punch NB and he did so.

188. Upon information and belief, well before defendants DeAlleaume and Reidy took any action to end the behavior set forth above in the Bridge Program, Sangalli, an aide in that program, reported the aberrant conduct occurring in the Bridge Program to DeAlleaume, who took no action.

189. Upon information and belief, well before defendants DeAlleaume and Reidy took any action to end the behavior set forth above in the Bridge Program, Sassone, another aide in that program, reported the aberrant conduct occurring in the Bridge Program to Delleaume, who took no action.

190. Defendant Spiegel was mandated to provide speech therapy for NB in a manner consistent with his IEP.

191. In mid-spring 2007, RB learned that defendant Spiegel had not provided speech therapy as required by NB's IEP.

192. RB then sought a log of the speech therapy actually provided, but Delleaume failed to provide her with on.

193. RB witnessed and was emotionally traumatized by the mis-treatment of other children in the Bridge Program.

194. As parents, each of the plaintiffs has been subjected to extreme emotional distress by the conduct of the defendants and each of them.

195. As parents, each of the plaintiffs and their minor children, have suffered severe anxiety, emotional distress, humiliation and trauma as a result of the actions and omissions of the defendants and each of them.

196. As parents, each of the plaintiffs has been caused to expend many, many hours and substantial funds as a direct consequence of the defendants' wrongful acts and omissions.

197. Defendant school district, Reidy and Delleaume were grossly negligent or negligent in hiring, training and/or supervising individual defendants Card, Spiegel, Levy, Reynolds and Streitas and such gross negligence and/or negligence was a proximate cause for the acts and omissions alleged herein and the damages resulting therefrom.

198. Defendants district, Reidy, DeAlleaume and Card each had a mandatory duty to supervise and prevent harm to the plaintiff children.

199. The injuries suffered by the minor plaintiffs are ongoing and, on information and belief, may be permanent in each case.

200. By policy, practice and/or custom, defendant district failed to properly hire, train and/or supervise teachers' aides and those assigned to interact with classified students.

201. Particularly in light of the vulnerability and the limited communication skills of the minor plaintiffs, the wrongful acts and omissions of defendants Card, Spiegel, Levy, Streitas and

Reynolds were foreseeable and proper supervision of the Bridge Program would have detected them and was necessary to prevent them.

202. Defendant Reidy was an official with policy-making authority with respect to defendant district's administration of the Bridge program.

## CAUSES OF ACTION

203. Plaintiffs incorporate paras. 1-202 as if fully re-written herein.

204. As set forth above, defendants' concerted conduct, as set forth above, is shocking to the conscience. By dint of that conduct, each defendant violated the right of each plaintiff, including the minor children, or facilitated/allowed the violation of each's right to substantive due process, as protected by the Fourteenth Amendment to the United States Constitution enforced by and through 42 U.S.C. sec. 1983.

205. The conduct of defendants Card, Spiegel, Streitas, Levy and Reynolds intentionally inflicted emotional distress upon plaintiffs, including the minor children, as their acts and omissions were atrocious and intolerable in a civilized society and without any legitimate basis.

206. The conduct of defendants district, Reidy and DeAlleaume negligently inflicted emotional distress as their negligent acts and/or omissions foreseeably and unreasonably endangered the physical safety of the minor children entrusted to their care and supervision.

207. The conduct of defendants district, Reidy and DeAlleaume was negligent, causing injury to each of the plaintiffs, including the minor children, supervision over whom was their mandatory duty.

208. By screaming at him with the intent of scaring him, defendant Levy assaulted JG III.

209. By making unauthorized physical contact with FA and scaring him, defendant Card

committed the torts of assault and battery against FA.

210.  By directing staff not to change MAS for a period of approximately one month, defendant Card inflicted extreme emotional distress upon him.

211.  By making unauthorized physical contact with VS, defendant Levy committed the torts of assault and battery against VS.

212.  By calling VS names intended to humiliate him, Card, Spiegel, Levy, Streitas and Reynolds intentionally inflicted emotional distress upon him.

213.  By rolling large balls at NB's feet attempting to cause him to fall, defendant Levy committed assault and battery against NB.

214.  By force-feeding RB and causing him to vomit on himself, defendant Card committed the tort of assault and battery upon him.

215.  By failing to provide services to vulnerable, primarily non-verbal students who could not speak for themselves, Spiegel fraudulently misrepresented herself to plaintiffs' detriment.

216.  By discriminating against plaintiff's children on the basis of their disability, defendants [and each of them] violated section 296 of the Executive Law of the State of New York.

217.  Defendant district is vicariously liable to plaintiffs for the negligent and intentional acts and omissions of its agents as set forth herein because the individual defendants' wrongful acts and omissions were facilitated by their employment with the school district and, though wrongful, were undertaken within the scope of their employment.

WHEREFORE, PLAINTIFFS request that this Honorable Court accept jurisdiction of

this matter, empanel a jury to hear and decide all contested issues of fact and award to plaintiffs

compensatory damages and punitive damages against all individual defendants and compensatory

damages against the district with pre and post-judgment interest and attorneys fees and costs

pursuant to 42 U.S.C. sec. 1983.

Respectfully submitted,

MICHAEL H. SUSSMAN [3497]

SUSSMAN & WATKINS
PO BOX 1005
GOSHEN, NY 10924
(845)-294-3991
COUNSEL FOR PLAINTIFFS

Dated: June 19, 2008
DATED: JUNE 20, 2008